## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

In re:

| | |
|---|---|
| BIG DADDY GUNS, INC., | CASE NO.: 23-10053-KKS |
| BIG DADDY GUNS 2, INC., | CASE NO.: 23-10054-KKS |

CHAPTER 11

Debtors.

Jointly Administered under
Case No.: 23-10053

_____/

BIG DADDY GUNS, INC. &
BIG DADDY GUNS 2, INC.,

Plaintiffs,

vs.                                              Adv. Proc. No.              -KKS

REDSTONE ADVANCE, INC., ZEN CAPITAL,
MEGED FUNDING GROUP CORP. a/k/a MEGED,
WYNWOOD CAPITAL GROUP LLC, RSR GROUP,
INC., JOHN DOES 1-10, and JOHN DOE
INVESTORS

Defendants.

_____/

**VERIFIED COMPLAINT[1] BY BIG DADDY GUNS, INC. &
BIG DADDY GUNS 2, INC. TO DECLARE CERTAIN
PURCHASE AND SALE AGREEMENTS TO BE LOAN
AGREEMENTS AND, AS LOAN AGREEMENTS TO BE
VOID ON ACCOUNT OF USURY, STATUS AS
CONTRACTS OF ADHESION, FRAUDULENT
CONVEYANCE AND PREFERENCE, FOR IMMEDIATE
TURNOVER OF INVENTORY AND FOR
DETERMINATION OF NATURE, EXTENT, VALIDITY
AND PRIORITY OF SECURITY INTERESTS AND
DISALLOWANCE OF ANY CLAIMS TO BE FILED**

---

[1] This Complaint is filed as a verified complaint in order that the Debtors can use it in the manner provided by Fed.R.Civ.P. Rule 65(b)(1)(A) in support of various motions contemplated to be brought in this proceeding.

## Contents

JURISDICTION AND VENUE ................................................................................1

NATURE OF THE ACTION ..................................................................................2

THE PARTIES .......................................................................................................6

COMMON FACTUAL ALLEGATIONS ...............................................................7

    A.    The Predatory MCA Industry.....................................................................7

    B.    The Sham .....................................................................................................8

    C.    The Bloomberg Awakening. .......................................................................8

    D.    The MCA Agreement is Substantively and Procedurally Unconscionable. 12

    E.    The MCA Lenders Intentionally Disguises the True Nature of the Transactions.......................................................................................................14

COUNT I.............................................................................................................18

Declaratory Judgment – Choice of Law (28 U.S.C. § 2201)...................................18

COUNT II............................................................................................................19

Declaratory Judgment – Adhesion Contracts (28 U.S.C. § 2201)...........................19

COUNT III ..........................................................................................................21

Declaratory Judgment -- Contracts are Loan Transactions (28 U.S.C. § 2201)......21

COUNT III ..........................................................................................................23

Declaratory Judgment -- Contracts are Loan Transactions (28 U.S.C. § 2201)......23

COUNT IV...........................................................................................................23

Declaratory Judgment -- Contracts are Usurious Loan Transactions as Defined in FL-ST 687 (28 U.S.C. § 2201) ...............................................................................23

COUNT V ...........................................................................................................25

Avoidance and Recovery of Preferential Transfers to Redstone (11 U.S.C. §§ 547 and 550).................................................................................................................25

COUNT VI...........................................................................................................28

Avoidance and Recovery of Fraudulent Transfers to Redstone (under 11 U.S.C. §§ 548 and 550)..........................................................................................................28

COUNT VII..........................................................................................................30

Avoidance and Recovery of Fraudulent Transfers to Meged (under 11 U.S.C. §§ 548 and 550)..........................................................................................................30

COUNT VIII.................................................................................................32

Avoidance and Recovery of Fraudulent Transfers to Zen (under 11 U.S.C. §§ 548 and 550)..............................................................................................32

COUNT IX..................................................................................................33

Determination of Nature, extent, validity and priority of Security Interests (under 11 U.S.C. §§ 548, and 544(b), FL-ST 726.101 et. seq. and 550) ...........................33

COUNT X...................................................................................................34

Fraudulent Transfers to Redstone (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et. seq.,  and 550) .............................................................................................34

COUNT XI..................................................................................................37

Avoidance and Recovery of Fraudulent Transfers to Meged (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et. seq.,  and 550).........................................................37

COUNT XII.................................................................................................40

Avoidance and Recovery of Fraudulent Transfers to Zen (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et. seq.,  and 550)..............................................................40

COUNT XIII................................................................................................42

Determination of Nature, extent, validity and priority of Security Interests (under 11 U.S.C. §§ 544(b), FL ST 726.001, 548 and 550) ................................................42

COUNT XIV................................................................................................43

Equitable Subordination (under 11 U.S.C. § 510(c)).............................................43

COUNT XV.................................................................................................44

DISALLOWANCE OF CLAIMS – 11 U.S.C. §502(b)(2) ....................................44

COUNT XVI................................................................................................44

DISALLOWANCE OF CLAIMS - 11 U.S.C. §502(d)..........................................44

COUNT XVII...............................................................................................45

DISALLOWANCE OF CLAIMS..................................................................45

(11 U.S.C. §558 & FL-ST 687.071) ..............................................................45

COUNT XVIII..............................................................................................45

EXTENSION OF THE AUTOMATIC STAY TO PROTECT GUARANTORS - FL-ST 687.071 (7) .....................................................................................45

COUNT XIX................................................................................................46

EXTENSION OF THE AUTOMATIC STAY TO PROTECT GUARANTORS –
11 U.S.C. §105 ........................................................................................................46

COUNT XX ..............................................................................................................49

REJECTION OF CONTRACTS UNDER 11 U.S.C. §365 ....................................49

UNSWORN DECLARATION AND VERIFICATION UNDER PENALTY OF
PERJURY ................................................................................................................51

BIG DADDY GUNS, INC. & BIG DADDY GUNS 2, INC. (the "Plaintiffs" or "Debtors), by their proposed counsel Jose I. Moreno and their proposed special bankruptcy counsel  pro hac vice, Davidoff Hutcher & Citron LLP, as and for their Complaint pursuant to 11 U.S.C. §§ 541 through 550 of title 11 of the United States Code (the "Bankruptcy Code"),  28 U.S.C. §2201, Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") file this Complaint against the Defendants, Redstone Advance, Inc., Zen Capital, Meged Funding Group Corp. a/k/a Meged Funding, Wynwood Capital Group LLC d/b/a Zen Capital, John Does 1-10, and John Doe Investors 1-10, and respectfully allege as follows:

## JURISDICTION AND VENUE

1.     On March 21, 2023 (the "Filing Date"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the above referenced bankruptcy case now pending before this Bankruptcy Court.

2.     This Adversary Proceeding is brought under and in connection with the above-referenced chapter 11 bankruptcy case that is now pending before this Bankruptcy Court.

3.     This Bankruptcy Court has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(b).

4.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

5.     This is a proceeding to determine the nature, extent, validity and priority of UCC and other security interests, and hence is a "core proceeding" under 28 U.S.C. § 157(b)(2)((A), (B),(K), M) and (O).

### NATURE OF THE ACTION

6.     This is an action against Redstone Advance, Inc. ("Redstone"), Zen Capital ("Zen"), Meged Funding ("Meged") ("Redstone," "Zen," "Meged" and "Wynwood Capital Group LLC," the alleged owner of Zen and Meged being, collectively where appropriate, the "MCA Lenders") and RSR Group Inc. ("RSR," for declaratory relief and to determine the nature, extent, validity and priority of their interests in the Estates and property of the Estates.

7.     The Debtors sought as alternative forms of financing were from the MCA Lenders. The MCA Lenders entered into contracts with the Debtors. The terms of the contracts were part of standard-form contracts prepared by the MCA Lenders. The terms of the contracts when considered in context were unduly oppressive, unconscionable and/or are against public policy. As a result of the unequal bargaining power and oppressive terms, the contracts between the Debtors and the MCA Lenders are contracts of adhesion.

8.     Copies of the contracts between Debtors and Redstone are attached hereto as Exhibit "1" (the "Redstone Contracts"). Copies of the contracts between Debtors and Zen are attached hereto as Exhibit "2" (the "Zen Contracts"). Copies of

2

the contracts between Debtors and Meged are attached hereto as Exhibit "3" (the "Meged Contracts") (the "Redstone Contracts," the "Zen "Contracts" and the "Meged Contracts" are collectively referred to as the "MCA Agreements")[2]. The contracts included security agreements purporting to secure the Debtors' obligations under the contracts.

9.     Although by their terms the MCA Agreements were clearly loans, the MCA Lenders, to avoid state usury laws and regulations, referred to the transactions as a "purchase and sale" of a "specified percentage" of the Debtors' future accounts, contracts and other obligations arising from the payment of monies from the Debtors' customers.

10.     The MCA Lenders' common scheme is to collect upon unlawful debts and otherwise fraudulently obtain funds from the Debtors through the use of their sham MCA agreements.

11.     Unfortunately, the type of conduct by the MCA Lenders is a ballooning national problem that has raised the attention of both state and federal regulators.

12.     In November 2018, Bloomberg News and renowned journalist Bethany McLean (of Vanity Fair acclaim) published what would be the first in a series of

---

[2] RSR claims only a lien on certain inventory and is included only for the purposes of determining the nature of their rights vis a vis the MCA Lenders

groundbreaking news articles exposing the abuses of the MCA industry, and its use of confessions of judgments to seize out-of-state bank accounts.[3]

13.     The New York Legislature quickly took action, banning the use of out-of-state confessions of judgment in September 2019. In support, the Legislature cited Bloomberg News.

14.     More recently, on February 10, 2022, Bloomberg News exposed a new tactic being abused by the predatory MCA industry, and a tactic used by the MCA Lenders here.

15.     Specifically, predatory MCA operators operate out of Florida but abuse an apparent loophole under Connecticut procedural law and New York substantive law to collect upon their unlawful debts. In doing so, the operators freeze out-of-state bank accounts by simply serving legal papers (which have not been reviewed or scrutinized by any court) on a bank that has a branch located in Connecticut. As justification for their bank freezes, the operators represent and attest under oath that their small business victims owe them a debt and that the operators are unaware of any defenses to their claims.

16.     In the alternative, MCA operators, including the MCA Lenders, obtain Connecticut default judgments that they domesticate to other states.

---

[3] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html; https://www.bloomberg.com/confessions-of-judgment

17.     In fact, on or about March 21, 2023, for example, Redstone filed to domesticate such a judgment to Alachua County, Florida, against the Debtors in violation of the automatic stay, 11 U.S.C. §362(a), and other non-debtor parties.

18.     According to Bloomberg News, this Connecticut loophole was used more than 180 times in 2021. The result of this tactic is often catastrophic because the operators can freeze out-of-state bank accounts without any notice whatsoever. Once frozen, the operators can then extort payment under duress due to their victims' need to save payroll or pay other necessary business expenses, such as insurance, taxes, rent and inventory.

19.     This tactic is especially harsh because even when the small business victim capitulates to the operator's extortionate demands, it is often too late because the release of those bank accounts may take days to unfreeze due to the processing delays and procedural constraints of individual banks and their levy departments.

20.     Despite its form, the transactions were, in substance and in every conceivable way, loans.

21.     In addition to the loans requiring usurious interest rates, The Debtors were required to pay processing fees and other expenses which are, in substance, additional interest under the MCA Contracts.

22.     Despite the provisions of MCA Contracts to the contrary, the Agreements must be governed and construed by the laws of the states of Florida.

23.     During the 90-day period preceding the bankruptcy ("Preference Period"), the Debtors made transfers to Redstone, consisting of certain replevins of inventory (the "Preference Period Replevins"), in the aggregate amount to be determined ("Preference Payments").

24.     The effect of this loan transaction, together with others, was to allocate substantially all of the Debtors' business cash flow to the MCA Lenders.

25.     During the term of the loan transactions, the MCA Lenders did business with the Debtors solely in the state of Florida.

## THE PARTIES

26.     Plaintiffs, the Debtors, have their principal place of business located in the State of Florida, counties of Alachua and Marion.

27.     Defendant Redstone is a Florida corporation with its principal place of business at 1688 N Meridian Ave., Suite 440, Miami Beach, Florida 33139.

28.     Zen is, upon information and belief,  a fictitious name, d/b/a of Wynwood.

29.     Meged Funding Group Corp. alleges that it is a  New York corporation and alleges it is authorized to do business in Florida, or in the alternative is a fictitious name, d/b/a of Wynwood.

30.     Wynwood is, upon information and belief, the owner or an affiliate of Zen and Meged.

## COMMON FACTUAL ALLEGATIONS

### A. The Predatory MCA Industry.

31.     The MCA Industry was spawned from the 2008 Financial Crisis. One of the earliest MCA companies, Yellowstone Capital LLC, was co-founded in 2009 by David Glass, an inspirational character for the movie "Boiler Room."[4] As Mr. Glass confessed to Bloomberg News, "it's a lot easier to persuade someone to take money than to spend it buying stock." Just like in the movie, MCA companies utilize high-pressure boiler room tactics, employing salespersons with absolutely no financial background whatsoever.

32.     As Bloomberg previously reported, the MCA Industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a banks."[5] The MCA Industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy." Id. As one of these brokers admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage. There's no license you need to file for. It's pretty much unregulated." Id.

---

[4] https://www.sec.gov/litigation/admin/2008/34-58574.pdf
[5] https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans

## B. The Sham

33.     Many states, such as Florida, have laws prohibiting the predatory interest rates. In order to evade these criminal usury laws, MCA companies disguise their agreements as "purchases of future receivables." MCA companies promote a fiction that, rather than making loans to merchants, they are purchasing, at a discount, a fixed amount of the merchant's future receivables, usually to be repaid through a fixed daily or weekly payment that purportedly represents a percentage of the merchant's receipts. The form of the contract thus allows MCAs to represent to courts that they, not the merchants, assume the risk that the merchants will fail to generate receivables. But the picture they paint is contrary to reality. By operation of their agreements' default rights and remedies, the MCA companies exert complete control over the relationship and compel their merchants to make the fixed payments or suffer the consequences.

## C. The Bloomberg Awakening.

34.     For nearly a decade, MCAs operated under the radar of regulators, compiling over 25,000 confessions of judgment against small businesses and their individual owners. That all changed on November 20, 2018, when Bloomberg News and renowned journalist Bethany McLean published what would be the first in a

series of groundbreaking news articles exposing the abuses of the predatory MCA industry.[6]

35.    As a direct result of the light shined on these abuses, the New York Legislature quickly enacted legislation extinguishing their weapon of mass destruction, the confession of judgment, expressly citing the Bloomberg articles as its inspiration.

36.    Congress also took notice. On June 26, 2019, the United States House of Representatives held a hearing titled: "Crushed by Confessions of Judgment: the Small Business Story." As explained by Professor Hosea Harvey, a contracts expert from Temple University, small businesses are just as susceptible to predatory lending as unsophisticated individuals.[7]

37.    Regulators have also taken action. On July 31, 2020, the New York Attorney General brought suit against a group of MCA companies, as well as their principals, alleging that their MCA agreements constitute criminally usurious loans.[8]

38.    On July 31, 2020, the Securities and Exchange Commission shut down an MCA company. In its complaint, the SEC alleged that Par Funding "made opportunistic loans, some of which charged more than 400% interest, to small

---

[6] https://www.yahoo.com/entertainment/merchant-cash-advances-salvation-small-businesses-payday-lending-reincarnate-161835117.html
[7] https://www.congress.gov/event/116th-congress/house-event/LC64251/text?s=1&r=60
[8] https://ag.ny.gov/press-release/2020/attorney-general-james-sues-predatory-lender-threatened-violence-and-kidnapping

businesses across America."[9] The FBI thereafter raided its offices, confiscating a cache of guns, millions of dollars in cash, and a private airplane.[10]

39.    On June 10, 2020, the Federal Trade Commission filed a complaint against John Braun and his various companies alleging various fraudulent and deceptive practices in connection with MCAs.

40.    On August 3, 2020, the Federal Trade Commission filed a complaint against Yellowstone.[11] Notably, the FTC complained that Yellowstone "unlawfully withdrew millions of dollars in excess payments from their customers' accounts, and to the extent they provided refunds, sometimes took weeks or even months to provide them." Id.

41.    On November 10, 2020, the California Commission of Financial Protection and Innovation entered into a Consent Order with Allup Financial LLC, finding that its MCA agreements were lending transactions subject to the California Finance Lenders Law, and barring the MCA company from doing business in California unless and until it complies with its laws.[12]

42.    On December 8, 2020, the New Jersey Attorney General also filed suit against Yellowstone, alleging it cheated "financially-strapped small businesses and

_____

[9] https://www.sec.gov/litigation/litreleases/2020/lr24860.htm
[10] https://www.inquirer.com/news/par-funding-better-financial-plan-joseph-laforte-dean-vagnozzi-20200731.html
[11] https://www.ftc.gov/news-events/press-releases/2020/08/ftc-alleges-merchant-cash-advance-provider-overcharged-small
[12] https://dfpi.ca.gov/wp-content/uploads/sites/337/2020/11/Consent-Order-Allup-Finance-LLC.pdf

their owners out of millions of dollars nationwide by luring them into predatory loans disguised as cash advances on future receivables with interest rates far exceeding the interest rate caps in the State's usury laws."[13]

43.    On December 23, 2020, New York signed into law the Small Business Truth in Lending Law, which is aimed at "protecting small business owners," and "requires key financial terms such as the amount financed, fees and annual percentage rate (APR) to be disclosed at the time a credit provider or broker makes an offer of financing of $500,000 or less."[14]

44.    As Gretchen Morgensen of NBC News recently reported, however, the financial greed of predatory lenders, like Defendants, has only accelerated in the wake of Covid-19.[15]

---

[13] https://www.njoag.gov/ag-grewal-files-suit-against-yellowstone-capital-llc-and-associated-companies-alleging-the-merchant-cash-advance-companies-targeted-small-businesses-with-predatory-lending-and-abusive-collection-pract/
[14] https://www.jdsupra.com/legalnews/gov-cuomo-signs-new-york-small-business-9450503/
[15] https://www.nbcnews.com/business/economy/feds-crack-down-lenders-targeting-small-businesses-high-interest-loans-n1236167

**D. The MCA Agreements are Substantively and Procedurally Unconscionable.**

45.    The MCA Agreements are contracts of adhesion that are not negotiated at arms-length, and unconscionable within the meaning of UCC Section 2-302, Florida Code 672.302.

46.    The MCA Agreement contain one-sided terms that prey upon the desperation of the small business and their individual owners and help conceal the fact that each of the transactions, including those involving the Plaintiffs, are really loans.

47.    Among these one-sided terms, the MCA Agreement include: (1) a provision giving the MCA company the irrevocable right to withdraw money directly from the merchant's bank accounts, including collecting checks and signing invoices in the merchant's name, (2) a provision preventing the merchant from transferring, moving or selling the business or any assets without permission from the MCA company, (3) a one-sided attorneys' fees provision obligating the merchant to pay the MCA company's attorneys' fees but not the other way around, (4) a venue and choice-of-law provision requiring the merchant to litigate in a foreign jurisdiction under the laws of a foreign jurisdiction, (5) a personal guarantee, the revocation of which is an event of default, (6) a jury trial waiver, (7) a class action waiver, (8) a collateral and security agreement providing a UCC lien over all of the merchant's assets, (9) a prohibition of obtaining financing from other sources, (10)

12

the maintenance of business interruption insurance, (11) an assignment of lease of merchant's premises in favor of the MCA company, (12) the right to direct all credit card processing payments to the MCA company, (13) a power-of-attorney to settle all obligations due to the MCA Company and (14) a power of attorney authorizing the MCA company to "file any claims or taken any action or institute any proceeding…"

48.     The MCA Agreements are also unconscionable within the meaning of UCC Section 2-302, Florida Code 672.302 because they contain numerous knowingly false statements. Among these knowingly false statements are that: (1) the transaction is not a loan, (2) the daily or weekly payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily or weekly payment is for the merchant's convenience, (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee or Underwriting Fee.

49.     The MCA Agreements are also unconscionable within the meaning of UCC Section 2-302, Florida Code 672.3 because they are designed to fail. Among other things, the MCA Agreements are designed to result in a default in the event that the merchant's business suffers any downturn in sales by preventing the merchant from obtaining other financing and requiring the merchant to continuously

represent and warrant that there have been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant.

50.     The MCA Agreements also contain numerous improper penalties that violate Florida's strong public policy. Among these improper penalties, the MCA Agreement (1) entitle the MCA company to attorneys' fees, (2) accelerate the entire debt upon an Event of Default, and (3) require the merchant to turn over 100% of all of its receivables if it misses just one fixed daily payment.

51.     The weekly payments under the MCA Agreements described below were fixed and absolute and the agreements' reconciliation provision was a sham.

52.     Defendants did not maintain reconciliation departments and did not have anyone trained or otherwise dedicated to performing any reconciliation of a merchant's accounts. Indeed, the MCA Agreement did not contain any functioning contact information whereby Plaintiffs could even request a reconciliation within the terms of that provision.

**E. The MCA Lenders Intentionally Disguise the True Nature of the Transactions.**

53.     Despite the documented form, the transactions are, in economic reality, loans that are absolutely repayable. Among other hallmarks of a loan:

(a)     The Payments are fixed and the so-called reconciliation provision are mere subterfuge to avoid this state's usury laws. Rather, just like any other loan, the Purchased Amount is to be repaid within a specified time;

14

(b)    The default and remedy provisions purport to hold the merchants absolutely liable for repayment of the Purchased Amount. The loans seek to obligate the merchants to ensure sufficient funds are maintained in the Account to make the Daily/Weekly Payments and, after a certain number of instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount becomes immediately due and owing;

(c)    While the agreements purport to "assign" all of the merchant's future account receivables to the MCA Lenders until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables including the right to collect, possess and use the proceeds thereof. Indeed, rather than purchasing receivables, The MCA Lenders merely acquire a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)    The MCA Agreements contemplate future advances and are thus a revolving line of credit despite representations to the contrary;

(e)    The transactions are underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(f)    The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid. Indeed, as part of the underwriting process, the Enterprise does not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(g)    The amount of the Payments is determined based upon when The MCA Lenders want to be paid, and not based upon any good-faith estimate of the merchant's future account receivables;

(h)    The MCA Lenders assume no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

15

(i)     The MCA Lenders require that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constitutes a default, which fully protects The MCA Lenders from any risk of loss resulting from the merchant's failure to generate and collect receivables.

(j)     The MCA Lenders require that the merchant grant it a security interest in its receivables and other intangibles and in connection with same filed UCC security interest as follows:

Against Big Daddy Guns, Inc.

| | "Lender" | Date | Remarks |
|---|---|---|---|
| 1. | Sports South LLC | 8/13/19 | Upon information and belief this is fully paid and satisfied |
| 2. | Worldwide Distributors | 1/19/21 | Upon information and belief this is fully paid and satisfied |
| 3. | Zen Capital | 12/30/21 | Arbitration award in the amount of $3,433,367.05. |
| 4. | Meged | 1/11/22 | Arbitration award in the amount of $3,313,576.91 |
| 5. | Redstone | 3/10/22 | |
| 6. | RSR | 5/19/22 | Upon certain inventory only and not accounts. Adversary proceeding seeks declaration on RSR's rights |

Against Big Daddy Guns 2, Inc.

| | "Lender" | Date | Remarks |
|---|---|---|---|
| 1. | Worldwide Distributors | 1/19/21 | Upon information and belief this is fully paid and satisfied |
| 2. | Zen Capital | 12/31/21 | Arbitration award in the amount of |

| | | | $3,433,367.05. |
|---|---|---|---|
| 3. | Meged | 1/11/22 | Arbitration award in the amount of $3,313,576.91 |
| 4. | Redstone | 3/10/22 | |
| 5. | RSR | 5/19/22 | Upon certain inventory only and not accounts. Not subject of this proceeding |

(k)    The MCA Lenders require further that the individual owners and other entities (the "Guarantors") guarantee the performance of the representations, warranties and covenants, which the Enterprise knew would be breached from day one.  A schedule of the Guarantors is annexed to the Redstone Agreements (Exhibit "1") as Exhibit "A" (the "Guarantor Schedule").

54.    Alternatively, in the event that the Contracts represent true sales of accounts receivable, the Debtors reject same as being burdensome to the Debtors' Estates.

55.    Pursuant to the Redstone Agreements, Redstone purported to have purchased 25% of the Accounts of the Debtors.

56.    Pursuant to the Meged Agreements, Meged purported to have purchased 25% of the Accounts of the Debtors.

57.    Pursuant to the Zen Agreements, Redstone purported to have purchased 20% of the Accounts of the Debtors.

58.    At all times relevant, the Debtors were insolvent within the meaning of FL-ST sec726.103 and 11 U.S.C. §101(32).

17

## COUNT I
## Declaratory Judgment – Choice of Law (28 U.S.C. § 2201)

59.     The Debtors realleges and incorporates each of the other allegations of this Complaint as if fully set forth herein.

60.     Both the Debtors and The MCA Lenders have their principal place of business in Florida.

61.     That the contracts at issue in this litigation were negotiated in Florida and were to be formed in Florida. The credit account transaction on accounts receivable were generated in Florida and the Debtors with which The MCA Lenders did business were organized and existing under the laws of the state of Florida.

62.     Pursuant to 28 U.S.C. § 2201, the Debtors seek declaratory judgment in which the court conclusively rules to affirm and determine that despite the choice of law provision set forth in the contract(s), that the disputes relating to the contracts are to be resolved under Florida.

63.     The Debtors seek a declaratory ruling from this court that Florida law applies to the contracts that were entered in that state.

## COUNT II
## Declaratory Judgment – Adhesion Contracts (28 U.S.C. § 2201)

64.     The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

65.     That the agreements that exist between The Debtors and the MCA Lenders are unconscionable within the meaning of UCC Section 2-302, Florida Code 672.302 and are contracts of adhesion. The contract terms unreasonably favored the drafter, were non-negotiable and are unenforceable, resulting from fraud, undue influence, failure of consideration and/or lack of meaningful consent.

66.     As an example, the Redstone Agreements are virtually identical, word for word, with the contracts between Redstone and Stellar Beach Rentals, LLC described in the Southern District of New York, Civil Proceeding 22 cv.955 entitled *Stellar Beach Rentals, LLC and John Kozak, Plaintiffs, -against- Redstone Advance, Inc., Gavriel Yitzchakov a/k/a Gabe Isaacov, Simon Yitzchakov a/k/a Simon Isaacov, City Capital NY LLC d/b/a Redstone Advance, Yoel Getter, Nair & Levin, P.C., John Does 1-10, and John Doe Investors 1-10, Defendants* (the "Stellar Beach Action"). One of the contracts at issue in the Stellar Beach Action (collectively, the "Stellar Beach Contracts") is annexed hereto as Exhibit "4".[16]

---

[16] On February 7, 2023 Hon. Vernon S. Broderick entered a TRO in the Stellar Beach Action, ECF Docket No. 7, a copy of which is annexed hereto as Exhibit "5". Judge Broderick required minimal security in the amount of $1,000.00.  Plaintiffs are advised that on March 31, 2023 Hon. Vernon S. Broderick announced in open Court that

67.    The similarities between the Stellar Beach Contract (Exhibit "4") and the Redstone Agreements, for example, that are issue in this case demonstrates that there is no bargaining and that these are contracts of adhesion.

68.    Since the contracts are unenforceable as adhesion contracts, the provisions relating to the arbitration, jury waiver, and other matters are unenforceable.

69.    Pursuant to 28 U.S.C. § 2201, the Debtors seek declaratory judgment in which the court conclusively rules to affirm and determine that the contract(s) are adhesion contracts and as such some or all of its provisions are unenforceable against the Debtors.

70.    That the Debtors seek a declaratory ruling from this Court that the contracts are contracts of adhesion and that the one-sided provisions favoring the MCA Lenders, including, without limitation, the choice-of-law, arbitration, jury waiver, and other provisions, are unenforceable against the Debtors.

---

he was granting Stellar Beach Rentals a preliminary injunction restraining Redstone from seizing or restraining Stellar Beach's bank accounts. Fed.R.Bankr.P. Rule 7065, in the Court's discretion, excuses a debtor, trustee or debtor in possession from posting any security..

## COUNT III

### Declaratory Judgment -- Contracts are Loan Transactions (28 U.S.C. § 2201)

71.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

72.    That the agreements between the Debtors and the MCA Lenders, despite their form, are loan transactions. As such, they are subject to the laws applicable to and governing loans in the jurisdictional states.

73.    That evidence of such loans can be drawn from the following:

    a.  Based upon information and belief, the Debtors were required to  submit a credit application and do a credit check before entering into the loan transactions.

    b.  Based upon information and belief, the loans were underwritten by  the MCA Lenders based on the assessment of the Debtors' creditworthiness.

    c.  Based upon information and belief, that the Debtors were required to execute a confession of judgment at the time of entering the transactions.

    d.  Based upon information and belief, that the Debtors were required to obtain a personal guaranty.

e.  Based upon information and belief, that the Debtors were required to authorize daily ACH withdrawals regardless of the amount and source of funds.

f.  Based upon information and belief, that the MCA Lenders made no attempt to  collect receivables owed by the Debtors' customers.

g.  Based upon information and belief, the contracts specified no interest rate and that had the purpose and effect of concealing the unconscionable within the meaning of UCC Section 2-302, Florida Code 672.302 and usurious interest rate and fees.

h.  Based upon information and belief, that the MCA Lenders obtained security agreements which is inconsistent with an acquisition of assets.

i.  Based upon information and belief, that the MCA Lenders' accounting records treat the transaction as a loan showing principle and interest payments.

74.    Pursuant to 28 U.S.C. § 2201, the Debtors seek declaratory judgment in which the court conclusively rules to affirm and determine that the contract(s) are loan transactions.

## COUNT III
### Declaratory Judgment -- Contracts are Loan
### Transactions (28 U.S.C. § 2201)

75.     The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

76.     The Debtors seek a declaratory ruling from this court that the contracts between the MCA Lenders and the Debtors are in fact loan transactions, despite any reference to the contrary, and are "extension(s) of credit" within the meaning of FL-ST 687.01 (d), which provides that "extension of credit means to make or renew a loan of money or any agreement for forbearance to enforce the collection of such loan."

## COUNT IV
### Declaratory Judgment -- Contracts are Usurious
### Loan Transactions as Defined in FL-ST 687 (28
### U.S.C. § 2201)

77.     The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

78.     FL-ST 687.02 states:

(1) All contracts for the payment of interest upon any loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious. However, if such loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation exceeds $500,000 in amount or value, then no contract to pay interest thereon is usurious unless the rate of interest exceeds the rate prescribed in s. 687.071.

23

79.    The amounts of each of the loans by each of the MCA Lenders is in excess of $500,000.

80.    The Debtors and each of the Guarantors are "Persons" within the meaning of FL-ST 1.01, which states:

> (3) The word "person" includes individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.

81.    The MCA Lenders are "Creditors" within the meaning of FL-ST 687.071(b).

82.    The Debtors and Guarantors are "debtors" within the meaning of FL-ST 687.071(3).

83.    The MCA Lenders are "Loan Sharks" within the meaning of FL-ST 687.071(f).

84.    The entry into the MCA Agreements constitutes "Loan Sharking" within the meaning of FL-ST 687.071(g).

85.    The interest rates charged by the MCA Lenders, as set out herein, exceed 45% per annum, within the meaning of FL-ST 687.071(3).

| MCA | Amount Promised (Contract Purchase Price) | Amount Advanced | Total To Be Paid Back (Contract Receivables Purchase Amount) | Effective Interest Rate Calc |
| --- | --- | --- | --- | --- |

| | | | | |
|---|---|---|---|---|
| **Redstone Advance** | $ 4,000,000 | $ 3,750,000 | $5,600,000 | 3.49% Weekly, 181.6% Annually |
| **Zen Capital** | $ 2,800,000 | $ 2,716,000 | $4,060,000 | 3.24% Weekly, 168.48% Annually |
| **Meged Funding Loan** | $ 1,200,000 | $ 1,164,000 | $1,740,000 | 3.24% Weekly, 168.48% Annually |

86.    FL-ST 687.071(7) provides "(n)o extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

87.    The Debtors seek recovery of all amounts paid to the MCA Lenders, voiding of all alleged obligations to the MCA Lenders together with damages and attorneys fees.

### COUNT V
**Avoidance and Recovery of Preferential Transfers to
Redstone (11 U.S.C. §§ 547 and 550)**

88.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

89.    Prior to the Petition Date, the Debtors transacted business with Redstone on account of which the Debtors were indebted to Redstone.

90.    Under the terms of the Contracts, Redstone purported to receive a security interest in the personal property of the Debtors only upon default (the "Security Interest Accrual").

91.    On a date not known to the Debtors, Redstone asserted the Security Interest Accrual, thereby improving its position with respect to the Debtors and their unsecured creditors.

92.    Redstone made Preference Period Replevins. Annexed hereto as Exhibit "6" is a copy of schedules filed by Redstone of Preference Period Replevins.

93.    The Preference Period Replevins constitute a transfer of an interest of the Debtors in property in payment on account of an antecedent debt.

94.    The Preference Period Replevins were made to and/or for the benefit of Redstone.

95.    The Preference Payments were made and the security interest, if any, was granted for or on account of an antecedent debt owed by the Debtors before such transfers and security interest were made and granted.

96.    Each of the Preference Payments were made and the security interest, if any, was granted while the Debtors were insolvent or in the alternative were rendered insolvent by virtue of the Security Interest Accrual and Preference Period Replevins.

97.    The Preference Payments and the security interest, if any, enabled Redstone to receive more than they would have received had such transfers not been made.

98.    The reported security interest, if any, of Redstone was not perfected at the beginning of the Preference Period or, in the alternative, was junior to a creditor that had a prior security interest.

99.    The Preference Period Replevins enabled Redstone to receive property in excess of what it would have received had the Debtors been liquidated in a case under Title 11, Chapter 7.

100.    Based on the foregoing, the Debtors are entitled to avoid the Preference Period Replevins and Redstone's security interest, if any, pursuant to section 547 of the Bankruptcy Code and to the Turnover of property seized in the Preference Period Replevins under 11 U.S.C. §542.

101.    Redstone is the initial transferee of the Preference Payments and the security interest, if any; the entities for whose benefit the Preference Payments were made and the security interest, if any, was granted; or the immediate or mediate transferees of the initial transferee receiving the Preference Payments and the security interest, if any.

102.    Based on the foregoing, the Debtors are entitled to recover the value of the Preference Payments from Redstone pursuant to section 550 of the Bankruptcy

Code and the Turnover of property seized in the Preference Period Replevins under

11 U.S.C. §542.

103.   The Defendants John Does 1-10 are entities/persons that may have

received the benefit of these Preference Period Replevins. The identity of these

entities/persons are presently unknown to the Debtors. When and if discovered they

will be added as Defendants to this action.

## COUNT VI
### Avoidance and Recovery of Fraudulent Transfers to
### Redstone (under 11 U.S.C. §§ 548 and 550)

104.   The Debtors reallege and incorporate each of the other allegations of

this Complaint as if fully set forth herein.

105.   The Debtors incurred obligations under Redstone Agreements (the

"Redstone Obligations"), purportedly granted Redstone a security interest, and made

Redstone payments ("Redstone Transfers"), consisting of the Redstone Monetary

Transfers as herein defined and replevins of inventory during the period of time

between 91 days prior to the Filing Date and two years prior to the Filing Date (the

"Two Year Replevins") for insufficient consideration.

106.   The Debtors incurred obligations under Redstone Agreements (the

"Redstone Obligations"), purportedly granted Redstone a security interest, and the

Debtors made or suffered certain payments and transfers, directly or indirectly, in an

amount aggregating no less than $1,199,999 (the "Redstone Monetary Transfers")

28

as well as the Two Year Replevins for insufficient consideration and on the basis of obligations unenforceable under FL-ST 687.01(7).

107.   Redstone the Two Year Replevins subsequent to the Security Interest Accrual.  Annexed hereto as Exhibit "6" is a copy of schedules filed by Redstone setting forth in detail the Two Year Replevins.

108.   The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Transfers.

109.   At the time the Transfers were incurred, granted, and/or made or as a result of the Transfers having been incurred, granted, and/or made, the Debtors were or became insolvent, or intended or believed it would incur obligations beyond its ability to pay as such obligations matured; or at the time the Transfers were incurred, granted, and/or made, the Debtors were engaged in business or a transaction, or was about to engage in business or a transaction, for which the property remaining in its hands was an unreasonably small capital.

110.   The Transfers were incurred, granted and/or made by the Debtors within two years of the Petition Date.

111.   Based on the foregoing, the Debtors are entitled to avoid the Two Year Replevins pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

112.   Redstone is the initial transferee of the Transfers, the entity or person for whose benefit the Two Year Replevins and the Redstone Monetary Transfers

were made, or the immediate or mediate transferees of the initial transferee receiving the Transfers.

113.    Based on the foregoing, the Debtors are entitled to recover the value of the Two Year Replevins and the Redstone Monetary Transfers from Redstone pursuant to section 550 of the Bankruptcy Code.

114.    That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

**COUNT VII**
**Avoidance and Recovery of Fraudulent Transfers to**
**Meged (under 11 U.S.C. §§ 548 and 550)**

115.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

116.    The Debtors incurred obligations under Meged's Agreements (the "Meged Obligations"), purportedly granted Meged a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $546,538 (the "Meged Transfers") for insufficient consideration.

117.    The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Meged Obligations and Meged Transfers

for the reason, among others, that the Meged Obligations are unenforceable under FL-ST 687.071(7).

118.   At the time the Meged Obligations and Meged Transfers were incurred, granted, and/or made or as a result of the Transfers having been incurred, granted, and/or made, the Debtors were or became insolvent, or at the time the Meged Obligations and Meged Transfers were incurred, granted, and/or made, the Debtors were engaged in business or a transaction, or was about to engage in business or a transaction, for which the property remaining in its hands was an unreasonably small capital.

119.   The Meged Obligations and Meged Transfers were incurred, granted and/or made by the Debtors within two years of the Petition Date.

120.   Based on the foregoing, the Debtors are entitled to avoid the Meged Payments pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

121.   Based on the foregoing, the Debtors are entitled to avoid the Meged Obligations.

122.   Based on the foregoing, the Debtors are entitled to recover the value of the Meged Payments pursuant to section 550 of the Bankruptcy Code.

123.   That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these

entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

**COUNT VIII**

**Avoidance and Recovery of Fraudulent Transfers to
Zen (under 11 U.S.C. §§ 548 and 550)**

124.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

125.    The Debtors incurred obligations under Zen's Agreements (the "Zen Obligations"), purportedly granted Zen a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $1,412,923 (the "Zen Transfers") for insufficient consideration for the reason, among other reasons, that the Zen Transfers are unenforceable under FL-ST 687.071(7).

126.    The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Zen Obligations and Zen Transfers.

127.    At the time the Zen Obligations and Zen Transfers were incurred, granted, and/or made or as a result of the Transfers having been incurred, granted, and/or made, the Debtors were or became insolvent, or at the time the Zen Obligations and Zen Transfers were incurred, granted, and/or made, the Debtors were engaged in business or a transaction, or was about to engage in business or a

transaction, for which the property remaining in its hands was an unreasonably small capital.

128.   The Zen Obligations and Zen Transfers were incurred, granted and/or made by the Debtors within two years of the Petition Date.

129.   Based on the foregoing, the Debtors are entitled to avoid the Zen Payments pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

130.   Based on the foregoing, the Debtors are entitled to avoid the Zen Obligations.

131.   Based on the foregoing, the Debtors are entitled to recover the value of the Zen Payments pursuant to section 550 of the Bankruptcy Code.

132.   That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

## COUNT IX
### Determination of Nature, Extent, Validity and
### Priority of Security Interests (under 11 U.S.C. §§ 548,
### and 544(b), FL-ST 726.101 et. seq. and 550)

133.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

134.   The MCA Lenders assert security interests in the Debtors' property upon and in the event of default under the MCA Agreements.

135.   Upon information and belief, 70% of the total accounts of the Debtors of the Debtors are assigned to the MCA Lenders.

136.   Upon information and belief, the gross margins of the Debtors' business is between 23% - 25%.

137.   Thus, the MCA Agreements are void or voidable on the basis of impossibility as well as unconscionability under UCC §2-302.

138.   The collateral reserved under the MCA Agreements is, upon information and belief, of no value to any of the MCA Lenders.

139.   As set forth in ¶53 above, the security interests reserved in the MCA Agreements were perfected, sequentially, in the order set forth therein.

140.   The Debtors request judgment of this court determining the relative priorities of the MCA Lenders, and finding them to be, at best, unsecured creditors or alternatively determining their relative nature, extent, validity and priority and their nature, extent, validity and priority vis a vis RSR.

## COUNT X

### Fraudulent Transfers to Redstone (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et. seq.,  and 550)

141.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

142.   The Debtors were insolvent within the meaning of FL-ST sec726.103.

143.   The Debtors, within the meaning of FL-ST §726.105, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the Debtor, entered into the Redstone Agreements.

144.   The Debtors incurred the obligations under the Redstone Agreements at a time that the Debtors were insolvent.

145.   The Debtors made the Redstone Transfers at a time that the Debtors were insolvent.

146.   Under FL-ST 726.106 a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

147.   The Debtors, at the time it made the Redstone transfers, had numerous unsecured creditors within the meaning of 11 U.S.C. §544(b) whose claims were unpaid.

148.   The Debtors incurred obligations the Redstone Obligations, purportedly granted Redstone a security interest, and made Redstone payments ("Redstone Transfers"), consisting of the Redstone Monetary Transfers as herein defined and the Two Year Replevins as herein defined for insufficient consideration.

149.   The Debtors incurred obligations under Redstone Agreements (the "Redstone Obligations"), purportedly granted Redstone a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $1,199,999 (the "Redstone Monetary Transfers") for insufficient consideration and on the basis of obligations unenforceable under FL-ST 687.01(7).

150.   Redstone suffered the making of the Two Year Replevins.  Annexed hereto as Exhibit "6" is a copy of schedules filed by Redstone of Two Year Replevins.

151.   The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Redstone Transfers.

152.   At the time the Redstone Transfers were incurred, granted, and/or made or as a result of the Transfers having been granted, and/or made, the Debtors were or became insolvent, or intended or believed it would incur obligations beyond its ability to pay as such obligations matured; or at the time the Transfers were incurred, granted, and/or made, the Debtors were engaged in business or a transaction, or was about to engage in business or a transaction, for which the property remaining in its hands was an unreasonably small capital.

153.   The Redstone Transfers were made, granted and/or made by the Debtors within two years of the Petition Date.

154.   Based on the foregoing, the Debtors are entitled to avoid the Two Year Replevins pursuant to section 548(a)(1)(B) of the Bankruptcy Code.

155.   Redstone is the initial transferee of the Redstone Transfers, the entity or person for whose benefit the Two Year Replevins and the Redstone Monetary Transfers were made, or the immediate or mediate transferees of the initial transferee receiving the Redstone Transfers.

156.   Based on the foregoing, the Debtors are entitled to avoid the Two Year Replevins and the Redstone Monetary Transfers from Redstone pursuant to section 544(b) as incorporating FL ST §§ 726.101 etc. § and recover the value of the Two Replevins under section 550 of the Bankruptcy Code.

157.   That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

## COUNT XI

### Avoidance and Recovery of Fraudulent Transfers to Meged (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et. seq.,  and 550)

158.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

159.   The Debtors incurred the Meged Obligations, purportedly granted Meged a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $546,538 (the "Meged Transfers") for insufficient consideration.

160.   The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Meged Obligations and Meged Transfers for the reason, among others, that the Meged Obligations are unenforceable under FL-ST 687.071(7).

161.   The Debtors were insolvent within the meaning of FL-ST sec726.103.

162.   The Debtors, within the meaning of FL-ST sec726.105, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor, entered into the Meged Agreements and incurred the obligations under the Meged Agreements at a time that the Debtors were insolvent.

163.   The Debtors made the Meged Transfers at a time that the Debtors were insolvent.

164.   Under FL-ST 726.106 a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the

transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

165.   The Debtors, at the time it made the Meged transfers, had numerous unsecured creditors within the meaning of 11 U.S.C. §544(b) whose claims were unpaid.

166.   The Debtors incurred obligations the Meged Obligations, purportedly granted Meged a security interest, and made the Meged Transfers.

167.   The Debtors incurred obligations under Meged's Agreements (the "Meged Obligations"), purportedly granted Meged a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $1,199,999 (the "Meged Monetary Transfers") for insufficient consideration and on the basis of obligations unenforceable under FL-ST 687.01(7).

168.   That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

## COUNT XII

### Avoidance and Recovery of Fraudulent Transfers to
### Zen (under 11 U.S.C. §§ 544 (b) FL-ST §§ 726.101 et.
### seq.,  and 550)

169.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

170.    The Debtors incurred the Zen Obligations, purportedly granted Zen a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $546,538 (the "Zen Transfers") for insufficient consideration.

171.    The Debtors received less than reasonably equivalent value in exchange for incurring, granting and/or making the Zen Obligations and Zen Transfers for the reason, among others, that the Zen Obligations are unenforceable under FL-ST 687.071(7).

172.    The Debtors were insolvent within the meaning of FL-ST sec726.103.

173.    The Debtors, within the meaning of FL-ST sec726.105, without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor, entered into the Zen Agreements and incurred the obligations under the Zen Agreements at a time that the Debtors were insolvent.

174.    The Debtors made the Zen Transfers at a time that the Debtors were insolvent.

175.   Under FL-ST 726.106 a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

176.   The Debtors, at the time it made the Zen transfers, had numerous unsecured creditors within the meaning of 11 U.S.C. §544(b) whose claims were unpaid.

177.   The Debtors incurred obligations the Zen Obligations, purportedly granted Zen a security interest, and made the Zen Transfers.

178.   The Debtors incurred obligations under Zen's Agreements (the "Zen Obligations"), purportedly granted Zen a security interest, and the Debtors made or suffered certain payments and transfers, directly or indirectly, in an amount aggregating no less than $1,199,999 (the "Zen Monetary Transfers") for insufficient consideration and on the basis of obligations unenforceable under FL-ST 687.01(7).

179.   That Defendants John Does 1-10 are entities/persons that may have received the benefit of these fraudulent transfers. The identity of these entities/persons are presently unknown to the Debtors. When and if discovered they will be added as Defendants to this action.

## COUNT XIII

### Determination of Nature, Extent, Validity and Priority of Security Interests (under 11 U.S.C. §§ 544(b), FL ST 726.001, 548 and 550)

180.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

181.    The MCA Lenders assert security interests in the Debtors' property upon and in the event of default under the MCA Agreements.

182.    Upon information and belief, 70% of the total accounts of the Debtors of the Debtors are assigned to the MCA Lenders.

183.    Upon information and belief, the gross margins of the Debtors' business is between 23% - 25%.

184.    Thus, the MCA Agreements are void or voidable on the basis of impossibility as well as unconscionability under UCC §2-302.

185.    The collateral reserved under the MCA Agreements is, upon information and belief, of no value to any of the MCA Lenders.

186.    As set forth in ¶53 above, the security interests reserved in the MCA Agreements were perfected, sequentially, in the order set forth therein.

187.    The Debtors request judgment of this court determining the relative priorities of the MCA Lenders, and finding them to be, at best, unsecured creditors

or alternatively determining their relative nature, extent, validity and priority and their nature, extent, validity and priority vis a vis RSR.

## COUNT XIV

### Equitable Subordination (under 11 U.S.C. § 510(c))

188.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

189.   The MCA Lender's transactions with the Debtors in "negotiating" the Redstone Agreement Obligations were not ethical or fair to the Debtors.

190.   The MCA Agreements are unconscionable within the meaning of UCC §2-302.

191.   The Debtors received insufficient consideration for incurring the MCA Agreement Obligations.

192.   Based on the foregoing, the Debtors request that the Court equitably subordinate the Debtors' obligations to the MCA Lenders to all other  unsecured creditors, and to RSR.

193.   In addition to the equitable subordination of the MCA Lenders' claims, the Debtors request that any vote by the MCA Lenders on any plan of reorganization be designated as not made in good faith under 11 U.S.C. §1126(e).

## COUNT XV

## DISALLOWANCE OF CLAIMS – 11 U.S.C. §502(b)(2)

194.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

195.   The claims of the MCA Lenders constitute, in whole or in part, unmatured interest.

196.   11 U.S.C. §502(b)(2) provides that to the extent a claim must be disallowed to the extent that same represents unmatured interest.

197.   The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XVI

## DISALLOWANCE OF CLAIMS - 11 U.S.C. §502(d)

198.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

199.   The MCA Lenders are the holder of preferential and fraudulent transfers that have not been returned to the Estates.

200.   11 U.S.C. §502(d) provides that to the extent creditor retains preferential and/or fraudulent transfers it does not hold a claim.

201.   The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XVII
## DISALLOWANCE OF CLAIMS

### (11 U.S.C. §558 & FL-ST 687.071)

202.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

203.   The obligations to the MCA Lenders are unenforceable under FL-ST 687.071(7).

204.   11 U.S.C. §558 provides that the Estates have the benefit of any otherwise applicable defense.

205.   The Debtors seek the disallowance of any claim filed by the MCA Lenders or otherwise asserted against the Estates.

## COUNT XVIII

## EXTENSION OF THE AUTOMATIC STAY TO
## PROTECT GUARANTORS - FL-ST 687.071 (7)

206.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

207.   The inclusiveness of the list of Guarantors (Exhibit "1," Schedule "A") effectively prevents Guarantors from providing any financial assistance to the Debtors.

208.   The Guarantors' financial assistance is necessary to the Debtors' reorganization.

209.   FL-ST 687.071(7) provides that any loan in excess of 45% interest per annum is unenforceable as a statutory matter.

210.   The Debtors request that the Court preliminarily and permanently enjoin the MCA Lenders from enforcing the MCA Agreements against any Guarantors pending further order of the Court.

**COUNT XIX**

**EXTENSION OF THE AUTOMATIC STAY TO
PROTECT GUARANTORS – 11 U.S.C. §105**

211.   The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

212.   11 U.S.C. §105 allows the Court to enter any order necessary or proper to effectuate reorganization.

213. Section 362(a)(1) of the Bankruptcy Code prohibits the "commencement or continuation . . . of a judicial . . . proceeding against the debtor that was or could have been commenced before the commencement of the case under

this title, or to recover a claim against the debtor that arose before the commencement of the case under this title."

214.   11 U.S.C. § 362(a)(1)  bars the continuation and commencement of actions by the MCA Lenders, which are unequivocally efforts to recover on claims against the Debtors, are automatically stayed. The MCA Lenders are seeking to hold the Debtors responsible for the MCA Contract Obligations. Thus, the commencement or continuation of any actions in any court in Florida, Connecticut or New York against the Guarantors can have only one purpose: the ultimate liquidation and recovery of claims against the Debtors. And, because the MCA Lenders against the Debtors concern  allege liabilities arising out of the Debtors' businesses prior to the Filing Date, such claims are expressly enjoined by the automatic stay.

215.   Likewise, the continuation and commencement of claims of the MCA Lenders are automatically stayed. Thus, the pursuit of these claims against the Guarantors is an effort to liquidate and recover claims against the Debtors.

216.   Additionally, the automatic stay imposed by section 362(a)(1) extends of its own force to enjoin actions against parties who share such an identity of interests with the Debtors in respect to those actions that the Debtors are, in effect, the real-party defendants. Here, the Guarantors share such an identity of interests with the Debtors that the Debtors, in effect, would be the real-party defendants in

the actions pressed by the MCA Lenders brought against Guarantors. Litigating, settling or attempting to establish the value of the claims against the Guarantors would liquidate claims against the Debtor, including by triggering existing indemnification and similar obligations of the Debtors to such entities. Such litigation also creates risks of binding the Debtors through res judicata and collateral estoppel, and creating an evidentiary record that prejudices the Debtor. Moreover, all liability for the MCA Lenders' claims are subject to material dispute. Because the Debtors are the real-party defendant in any suit seeking to liquidate and recover on account of an MCA Lenders claim, section 362(a)(1) stays such actions.

217.    Section 362(a)(3) of the Bankruptcy Code operates automatically to stay, among other actions, "the commencement or continuation . . . of a . . . proceeding against the debtor . . . to obtain possession of . . . or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). The section 362(a)(3) stay applies here in two ways.

218.    Section 362(a)(3) bars the MCA Lenders from bringing or prosecuting actions against the Debtors or restricting their use of their inventory and accounts

219.    Accordingly, and in line with judicial authority and precedent with respect to the application of the automatic stay, the declaratory relief the Debtors seek in this Complaint and motions to be brought are necessary and appropriate to protect the integrity of the automatic stay and the bankruptcy proceeding.

220.    The Debtors request that the Court preliminarily and permanently enjoin the MCA Lenders from enforcing the MCA Agreements against any of the Guarantors pending further order of the Court.

## COUNT XX

## REJECTION OF CONTRACTS UNDER 11 U.S.C. §365

221.    The Debtors reallege and incorporate each of the other allegations of this Complaint as if fully set forth herein.

222.    The Court may, in its discretion, deem the Contracts to be the purchase of receivables and not a loan.

223.    The Debtors' gross margins in their business approximates 23% - 25%.

224.    Performance under the Contracts is a practical impossibility.

225.    The Contracts are burdensome to the Estates.

226.    The Debtors reject the Contracts under 11 U.S.C. §365(a).

**WHEREFORE,** Plaintiffs demand judgment avoiding all transfers obligations to the MCA Lenders under 11 U.S.C. §548, avoiding all transfers to MCA Lenders within 90 days of the Petition Date as preferences under 11 U.S.C. §547, returning all such transfers to the Debtors under 11 U.S.C. §550, annulling all obligations to the MCA Lenders under FL-ST 687.701 and awarding the Debtors damages, punitive damages and attorney's fees as the Court may determine to be just, and  and entering money judgment in an amount to be determined by the Court, together with such other and further relief as this Court deems just and proper.

Dated: Gainesville, Florida
         April 11, 2023

JOSE I. MORENO, P.A.
*Proposed Counsel for the Debtors*
Florida Bar No. 659460
240 NW 76th Drive, Suite D
Gainesville, FL 32607
(352) 332-4422
Jimorenolaw@gmail.com
By: /s/ Jose I. Moreno
         Jose I. Moreno, Esq.

DAVIDOFF HUTCHER & CITRON LLP
*Proposed Special Counsel for the Debtors*
New York Bar No. 1674118
605 Third Avenue
New York, New York 10158
(212) 557-7200
rlr@dhclegal.com

By:/s/
         Robert L. Rattet, Esq.

## UNSWORN DECLARATION AND VERIFICATION
## UNDER PENALTY OF PERJURY

Anthony McKnight declares, under penalty of perjury pursuant to 28 U.S.C. §1746 that the foregoing Complaint is true and correct to the best of his knowledge, information and belief. This Complaint is a verified complaint within the meaning of Fed.R.Civ.P. Rule 65(b)(1)(A).

ANTHONY McKNIGHT

51